**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JAMES SYNNOTT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 16 C 9098** |
| ) | |
| **PAUL BURGERMEISTER, IAN NORTHRUP,** ) | |
| **and SHERIFF OF DUPAGE COUNTY,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Pro se plaintiff James Synnott prevailed at trial against Paul Burgermeister and

Ian Northrup, two deputies in the DuPage County Sheriff's Office, on his claims under

the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983. The jury found

that both Northrup and Burgermeister unlawfully entered Synnott's home without

knocking or announcing their presence and that Northrup used excessive force by

pointing his gun at Synnott. The jury awarded Synnott $250,000 in compensatory

damages and $100,000 in punitive damages. The defendants have moved for

judgment as a matter of law or alternatively for a new trial. Synnott, despite obtaining

this favorable verdict, has also moved for a new trial.

**Background**

**A.      Procedural history**

In September 2016, Synnott sued a wide range of individuals and entities,

including his ex-wife, her attorneys, Burgermeister, Northrup, the DuPage County

Sheriff's Office, and several DuPage County judges. After the Court dismissed his complaint because it was too unintelligible to permit the Court to discern whether there was a basis for federal jurisdiction, he filed an amended complaint alleging that the defendants violated his constitutional rights. The claims primarily involved actions in and around Synnott's divorce and child custody proceedings but also included claims against certain of the defendants arising out of an alleged illegal entry into Synnott's home in connection with an apparent attempt to serve him with legal papers.

The Court dismissed all but three counts of the amended complaint, specifically, those alleging Fourth Amendment violations and related state-law claims against Northrup and Burgermeister regarding the entry into Synnott's home. *See* dkt. no. 14. Synnott filed a second amended complaint, which the Court dismissed because it failed to rectify the defects in the previous complaints. *See* dkt. no. 26. The Court gave Synnott a final opportunity to amend, and he filed a third amended complaint that included only the claims against Northrup and Burgermeister. The Court concluded that this version of the complaint was legally sufficient and allowed the case to proceed. *See* dkt. no. 29.

In January 2019, the Court set dates for the trial and final pretrial conference in April 2019. About one month before the trial was scheduled to begin, Synnott filed a motion for an extension of time to file the final pre-trial order and for a continuance of the trial date. The Court denied the motion because Synnott had failed to show good cause for the extension. However, the Court permitted the parties to forego filing a full final pretrial order, instead requiring only lists of witnesses, exhibits, and proposed questions for voir dire. *See* dkt. no. 98. Synnott filed a written motion for

2

reconsideration of the Court's ruling denying the motion for an extension of time, which the Court denied at the final pretrial conference. The case proceeded to trial as scheduled on April 30, 2019.

## B.    Trial evidence

At trial, Synnott and his sisters, Deborah Synnott and Michelle Davy, testified about the events of January 2, 2016. It was undisputed at trial that Burgermeister and Northrup entered Synnott's house on that date. At the time, Synnott's sisters (to whom the Court will refer by their first names for ease of reference) were present in the home. The parties agree that the deputies entered the house and that a heated conversation or argument ensued. The deputies remained there for approximately half an hour to an hour before leaving. No one was arrested or physically injured during the incident.

Beyond those basic facts, at trial each side offered a different account of what transpired. Synnott, Michelle, and Deborah testified that the front door to the house was closed and that the deputies entered the house without being let in and without knocking at the door, ringing the doorbell, or announcing that they were law enforcement officers. They stated they heard the deputies calling out Synnott's first name as they entered. Although Michelle did not testify to seeing either deputy point his gun at Synnott, both Synnott and Deborah stated that each deputy drew his weapon. Specifically, they testified that Burgermeister entered the house, went into the attached garage through an open door, and encountered Synnott. According to Synnott and Deborah, Burgermeister pointed his gun at Synnott for a period of time before holstering his weapon and following Synnott back into the house. Synnott and Deborah testified that once Synnott, his sisters, and the deputies were all gathered in or around the den,

3

Northrup pointed his gun at Synnott and interrogated him about his ownership of the house.

Burgermeister and Northrup also testified at trial. They testified that they entered the house because they saw the front door standing open and had reason to believe that the house's occupants might be elderly and in danger. They also stated that before they entered the home, they knocked on the door loudly and announced that they were from the sheriff's office. Burgermeister denied removing his gun from its holster at any point during the incident, but both Burgermeister and Northrup testified that Northrup did take out his gun at some point during the incident.

After trial, the jury found both Northrup and Burgermeister liable for unlawfully entering Synnott's home and failing to knock and announce their presence. The jury also found that Northrup, but not Burgermeister, used excessive force against Synnott. It awarded $250,000 in compensatory damages and $100,000 in punitive damages ($70,000 against Northrup and $30,000 against Burgermeister). The defendants have moved for judgment as a matter of law or alternatively for a new trial. Synnott has also moved for a new trial. For the reasons explained below, the Court grants the defendants' motion insofar as the defendants seek remittitur of the compensatory damages award but otherwise denies both motions.

**Discussion**

**A.    Synnott's motion**

Several weeks after the trial concluded, Synnott filed a motion styled as a request "for a supplemental trial and leave to amend complaint." Dkt. no. 131. In that motion, Synnott sought leave to file a fourth amended complaint requesting declaratory

4

and injunctive relief—namely, to have certain Illinois statutes regarding child custody declared unconstitutional and to obtain injunctions to reform the DuPage County law enforcement and judicial systems with respect to child custody decisions. The Court denied the motion, explaining that the case had already been tried and was near its conclusion and that Synnott could not amend his complaint to raise new claims. *See* dkt. no. 133. The Court later revised that ruling, noting that although Synnott was not permitted to amend his complaint at this very late stage, the portion of his motion seeking a "supplemental trial" could be appropriately construed as a motion for a new trial under Rule 59. *See* dkt. no. 139.

To the extent Synnott seeks a new trial, he contends that the Court erred by denying his motions for an extension of time and to continue the trial date, limiting his cross-examination of Burgermeister, and failing to permit him to introduce certain evidence of his damages. Synnott also contends that the defense attorneys engaged in misconduct that deprived him of a fair trial and that the jury's damages award was insufficient to compensate him for the harm he suffered. The Court will address each argument in turn.

### 1.    Denial of motions for extensions of time

Synnott argues that the Court erred in denying his motion to extend time to file the final pretrial order and continue the trial date. He argues that this decision deprived him of the opportunity to fully prepare for trial, including preparing to make appropriate objections and having impeachment evidence ready for cross-examination.

The Court partially accommodated Synnott's request by relieving the parties of the obligation to file a full-blown final pretrial order. But the Court denied the motion to

continue the trial date and Synnott's subsequent motion to reconsider that denial. At the final pretrial conference, the Court noted that twenty months had passed since the defendants filed their response to the third amended complaint. In addition, the Court observed that it had set dates for the pretrial conference and the trial on January 16, 2019—leaving Synnott with two and a half months to work on the final pretrial order and three months to prepare for trial. The Court acknowledged that Synnott was proceeding pro se but explained that the scope of the case had become quite narrow—focused entirely on the alleged unlawful entry—after the Court had dismissed most of his claims. Under these circumstances, and especially after the Court largely excused Synnott's failure to file a final pretrial order, the Court was not and is not persuaded that it was error to deny his motion to push back the trial date. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) ("District courts have considerable discretion to manage their dockets and to require compliance with deadlines.").

In any case, Synnott has not shown that he was prejudiced by the denial of his motion. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 602 (7th Cir. 2019) (explaining that "a new trial is appropriate" when "errors occurred and the trial was fundamentally unfair as a result"). He overwhelmingly prevailed at trial, with the jury ruling in his favor on all but one claim and awarding him substantial compensatory and punitive damages. And, as the Court repeatedly noted throughout the proceedings, Synnott performed well in representing himself at trial. *See* Trial Tr. Vol. 2–A, dkt. no. 166, at 42:5–12, 78:19–25; Vol. 3–A, dkt. no. 167, at 271:3–7. Beyond general references to impeachment evidence and objections, he has failed to point to instances in which the denial of his motion to continue the trial date made the proceedings unfair.

6

The Court is therefore not persuaded that this supposed error is a basis on which to grant a new trial.

### 2. Limitations on cross-examination of Burgermeister

Synnott next argues that the Court improperly restricted his cross-examination of Burgermeister. Synnott examined Burgermeister for about one hour on the second day of the trial. At the end of the day, the Court ruled that Synnott would be allowed only an additional forty-five minutes of cross-examination the following morning because he had spent nearly all of the first hour questioning Burgermeister on irrelevant topics. The next day, after Synnott had used his remaining time, the Court told Synnott at sidebar that his questioning that morning had largely been "very focused and very good" and granted Synnott more time—an additional twelve minutes. Trial Tr. Vol. 3–A, dkt. no. 167, at 271:2–7.

These rulings were neither erroneous nor an abuse of the Court's discretion. *Cf. Crabtree v. Nat. Steel Corp.*, 261 F.3d 715, 720 (7th Cir. 2001) ("A district court that fixes a period of time for the trial as a whole does not per se commit an abuse of discretion so long as the time limit is flexible enough to accommodate adjustment if it appears during the trial that the court's initial assessment was too restrictive."). The Court restricted the length of Synnott's cross-examination of Burgermeister only after Synnott had spent undue time on irrelevant and cumulative attempts to impeach Burgermeister.[1] After the Court imposed a time limit, the quality of Synnott's questions improved considerably, and the Court granted him additional time in recognition of this.

---

[1] The Court imposed a similar twenty-minute time constraint on the defendants' attorney's cross-examination of Synnott following a stretch of argumentative and inappropriate questioning. *See* Trial Tr. Vol. 4–A, dkt. no. 168, at 483:21–484:4.

And despite the time constraints, his cross-examination was detailed and thorough. The Court acted within its discretion in imposing these restrictions, and Synnott has not shown that they caused him prejudice.

### 3.    Conduct of the defendants' attorneys

Synnott next contends that he is entitled to a new trial based on the alleged misconduct of the defendants' attorneys.  He first argues that the attorneys improperly brought up the issue of his child custody case.  The only instance he cites occurred during the cross-examination of his sister Michelle, when the defendants' attorney asked whether she knew of other instances in which sheriff's deputies came to Synnott's home.  Davy Testimony, Trial Tr. Vol. 2–A, dkt. no. 166, at 95:7–18.  But these questions do not refer to the custody case, and Synnott does not explain what connection, if any, they bear to any excluded evidence.  The only other questions the defendants asked about the custody case came after Synnott himself volunteered during cross-examination that he felt he could not seek psychiatric treatment because it would affect the custody court's determination of his parental fitness.  After the Court permitted Synnott to clarify this answer on redirect, the defendants' attorney asked a question about the ruling date in his custody case.  *See* Synnott Testimony, Trial Tr. Vol. 4–A, dkt. no. 168, at 507:8.  The attorney withdrew the question before Synnott answered, however, and Synnott has not explained how merely posing this question after he himself first testified about the existence of custody proceedings caused him any unfair prejudice.  *See Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("[T]he misconduct of counsel justifies a new trial where that misconduct prejudiced the adverse party.").

8

Synnott next argues that the defendants' attorneys suborned perjury by asking questions that they knew would elicit false answers. But although he contends that Burgermeister and Northrup were not truthful in their testimony—a contention with which the jury evidently agreed, at least in part—he has not pointed to any evidence that the defendants' attorneys were aware of the falsity such that their questioning would be improper. *See, e.g.*, Model R. Prof. Conduct 3.3(a) (ABA 2018) ("A lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false."). Synnott has therefore failed to show that the alleged misconduct occurred such that he suffered prejudice warranting a new trial. *See Willis*, 687 F.3d at 836.

### 4.    Damages issues

Finally, Synnott contends that a new trial is warranted because the Court erred in its rulings concerning evidence of damages. He first argues that the Court should have permitted him to introduce evidence that the defendants' Fourth Amendment violations caused him to lose custody of his child by undermining his ability to litigate his child custody proceedings. Synnott made this same argument before trial. At the final pretrial conference, however, Synnott was unable to explain any way in which the defendants' conduct affected the outcome of custody case. *See* Tr. of Final Pretrial Conf., dkt. no. 164, at 59:23–65:5. Even after this, the Court gave Synnott an additional opportunity to explain the supposed connection, but he was unable to do so in a coherent manner. *See* Order on Recoverable Damages, dkt. no. 112, at 2-3. And the defendants submitted evidence that by the time the sheriff's deputies came to Synnott's home, the trial court in his custody case had awarded sole custody to his daughter's mother thirteen months earlier. Moreover, his appeal of that custody order appears to

9

have been dismissed because the trial court had not yet issued an appealable final order, not because Synnott "did anything wrong or missed any deadlines." *Id.* at 2. Synnott thus did not explain the relevance of this damages evidence such that he should have been permitted to introduce it.

Although the Court excluded testimony that "the defendants' actions had an impact on decisions made in his child custody dispute," *id.* at 4, at trial Synnott was permitted to testify about the personal impact of the incident on his ability to litigate the custody case. Specifically, during his redirect testimony, the Court prompted him to explain the relationship between his custody case and his decision not to seek psychiatric or other medical treatment. *See* Synnott Testimony, Trial Tr. Vol. 4–A, dkt. no. 168, at 499:6–22. The Court then prompted Synnott to testify regarding the impact of the incident on his own ability to litigate the case, though not about its effect on the outcome of the case. *Id.* at 502:15–503:13.

Synnott appears to contend that the Court erred in excluding testimony about whether the incident on January 2, 2015 affected the outcome of the child custody proceedings. But his post-trial briefs do not shore up the defect in his previous arguments and written submissions—i.e., his failure to explain how the defendants' Fourth Amendment violations affected the outcome. He primarily argues that the Court was wrong to rely on the order of the trial court in the custody case because that ruling was legally erroneous and unconstitutional. But the Court did not and does not rely on that order for anything more than the proposition that the course of his custody proceedings bore no apparent causal relationship with the wrongdoing alleged in Synnott's claims in this case. Synnott has not explained why the supposed fact that the

order was erroneous precludes the Court from taking its timing into account in determining whether the outcome of the custody case had any relevance on the question of damages arising from the defendants' unlawful entry into Synnott's home.

Synnott also argues that he should have been allowed to introduce evidence— and the Court should have instructed the jury—that DuPage County indemnified Burgermeister and Northrup. This argument lacks merit. Evidence of indemnification is generally inadmissible due to "a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill." *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998). Synnott contends that the defendants opened the door to this evidence, but he cites only a passing reference in Burgermeister's testimony to the fact that he is now retired, which is a far cry from "pleading poverty" as typically required to open the door to indemnification evidence. *See id.*

Last, Synnott contends that the jury's compensatory damages award was insufficient given the evidence of the harm he suffered. As the Court will discuss with respect to the defendants' request for remittitur, the $250,000 that the jury awarded him *exceeds* the amount that is rationally supported by the trial evidence and comparable cases. And to the extent that Synnott objects that the trial did not result in the declaratory and injunctive relief he hopes to obtain, those arguments are not relevant to his motion for a new trial, which concerns only his claim for damages against Northrup and Burgermeister for violating his Fourth Amendment rights—not the panoply of other claims that the Court has long since dismissed.

For these reasons, the Court denies Synnott's motion for a new trial.

11

**B.      Defendants' motion**

The defendants have moved for judgment as a matter of law under Rule 50 or alternatively for a new trial under Rule 59.  Judgment as a matter of law is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1); *Martin v. Milwaukee County*, 904 F.3d 544, 550 (7th Cir. 2018).  The Court may not assess credibility or weigh evidence, and it must "construe the evidence in favor of the party who won before the jury."  *Martin*, 904 F.3d at 550.

Under Federal Rule of Civil Procedure 59, the party seeking a new trial must show that the verdict is against the clear weight of the evidence or the trial was unfair to the moving party.  *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018). "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict."  *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (alteration in original).  In making this determination, the Court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial."  *Id.*

**1.      Sufficiency of the evidence of excessive force**

The defendants first argue that the jury's finding that Northrup used excessive force was contrary to the evidence and that they are therefore entitled to judgment as a matter of law or a new trial.  Specifically, they contend that the evidence did not reasonably support the conclusion that Northrup used his weapon to seize or detain Synnott.

12

Synnott argues that with respect to the motion for judgment as a matter of law, the defendants forfeited this argument by failing to raise it in a Rule 50 motion before the jury reached its verdict.  At the close of evidence, one of the defendants' attorneys stated, "I would like to put on the record, the Rule 50(a) motion, waive argument at this time."  Trial Tr., Vol. 4–A, dkt. no. 168, at 520:25–521:2.  The Court took the motion under advisement, and the defendants' attorney added, "With respect to all three claims."  *Id.* at 521:4–5.  That was the entirety of defendants' motion and argument.  At no time did they make any further written or oral arguments in support of their motion.

In general, a party forfeits any arguments it withholds "until its post-trial Rule 50(b) renewed motion for judgment as a matter of law."  *Webster v. CDI Ind., LLC*, 917 F.3d 574, 578 (7th Cir. 2019).  "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."  *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010).  Because the defendants did not raise *any* grounds in their perfunctory pre-verdict Rule 50 motion—and indeed affirmatively declined to make an argument in support of the motion—the arguments in support of the renewed post-trial motion are forfeited.

The defendants rely on *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768 (7th Cir. 2002), in which the Seventh Circuit held that the plaintiffs had preserved their arguments under Rule 50 even though they did not specifically raise them in the pre-verdict motion.  But in *A & C Environmental*, the court reasoned that in numerous pre-trial briefs the plaintiffs had repeatedly made the same arguments advanced in their motion for judgment as a matter of law, thereby satisfying Rule 50's goal of providing notice to the opposing party of the basis of the motion.  *Id.* at 777.

13

Here, the defendants do not point to any instances prior to the verdict in which they argued that there was insufficient evidence to permit a reasonable jury to find that Northrup used his weapon to seize Synnott. *A & C Environmental* therefore does not provide a basis to excuse the defendants' failure to timely raise their arguments for judgment as a matter of law.

Even if this argument were not forfeited, neither judgment as a matter of law under Rule 50 nor a new trial under Rule 59 would be appropriate; the evidence reasonably supports the jury's conclusion that Northrup used excessive force. The defendants contend that "the evidence does not support" a finding that a weapon "was used as a means of seizing or detaining an individual." Defs. Reply Br., dkt. no. 159, at 2. But the defendants' own statements at trial belie this argument. In particular, Burgermeister testified that Northrup had his gun out during the incident, and Northrup testified that Synnott and his sisters were detained and not free to leave. These statements—together with Synnott and his sister Deborah's testimony that Northrup pointed his gun at Synnott during the encounter—reasonably support the jury's conclusion that Northrup seized Synnott by brandishing his weapon.

The defendants also argue that the evidence does not show that Northrup used excessive force as a matter of law. The Seventh Circuit has held, however, that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). The jury could have reasonably concluded that Synnott and his sisters posed no threat to Northrup because, unlike the deputies, they are not physically imposing and were unarmed. The defendants point out that in *Baird*, the law enforcement officer used a submachine gun

14

while performing search. But this argument misses "the critical point," which is that "police are not entitled to point their guns at citizens when there is no hint of danger." *Id.* at 346. The jury's verdict on Synnott's excessive force claim thus is not against the manifest weight of the evidence.

### 2. Inconsistency of the verdict

The defendants next argue that a new trial is warranted because the jury could not have rationally returned verdicts against Northrup but in favor of Burgermeister on the excessive force claim. The Court must attempt to reconcile apparently inconsistent verdicts, and a new trial is appropriate only if "no rational jury could have brought back the verdicts that were returned." *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005) (internal quotation marks omitted). The Seventh Circuit has explained that "[a]ny plausible explanation for the verdict precludes reversal." *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010).

The defendants contend that it was irrational for the jury to conclude that one defendant but not the other violated Synnott's Fourth Amendment rights. They point out that Synnott argued that both defendants pointed their guns at him and relied on the same evidence—his own testimony and that of his sister Deborah—to support those arguments. But although the defendants correctly note that Synnott and Deborah testified that both Northrup and Burgermeister pointed their guns at Synnott, the defendants themselves testified differently. Significantly, both Northrup and Burgermeister admitted that Northrup drew his gun during the incident, whereas Burgermeister denied that he personally did so. *See* Northrup Testimony, Trial Tr. Vol. 3–B, dkt. no. 167, at 370:12–20 ("I don't deny that my weapon was unholstered.");

15

Burgermeister Testimony, *id.* at 250:13–20, 251:13–17 ("I did not have my weapon out of my holster.").

The jury could have reasonably concluded that only Northrup used excessive force if it believed Burgermeister's statements that he never unholstered his gun.  It is the province of jury "to decide whose testimony to credit."  *Whitehead*, 680 F.3d at 927.  And to the extent that Burgermeister's testimony partially contradicted the statements of Synnott and Deborah, it is plausible that the jury credited their testimony with respect only to Northrup's conduct and not Burgermeister's.  *See United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) ("[I]t is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences."); *NLRB v. Gen. Time Corp.*, 650 F.2d 872, 876 (7th Cir. 1981) ("The resolution of conflicts in testimony is peculiarly within the domain of the trier of fact.").  This explanation for the jury's verdict finds additional support in the fact that the jury assessed $70,000 in punitive damages against Northrup but only $30,000 against Burgermeister, suggesting that the jury viewed Northrup's conduct as more reprehensible.[2]

In short, the evidence reasonably permitted the jury to find only Northrup liable for excessive force.  The defendants are therefore not entitled to a new trial on that basis.

### 3.    Compensatory damages

The defendants next argue that the jury's compensatory damages award of

---

[2] In addition, the jury reasonably could have found that the factual circumstances under which Burgermeister and Northrup brandished their weapons were sufficiently different to call for different outcomes on the excessive force claims against each of them.

$250,000 is excessive.  The Court must consider three factors in determining whether remittitur is appropriate:  "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicate that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) [ ] the award is roughly comparable to awards made in similar cases."  *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

At trial, Synnott testified about the mental and emotional consequences of this incident.  He stated that the interaction with the deputies had a significant and lasting negative impact on his mood, temperament, and ability to cope with stress.  *See* Synnott Testimony, Trial Tr. Vol. 3–B, dkt. no. 167, at 413:3–15.  Although Synnott did not extensively describe his emotional pain, he did testify that he felt humiliated and pathetic in having to recount the details of the incident and the resulting harm.  *See id.* at 412:21–413:2; 415:4–5.  The Seventh Circuit has held that the fact that the plaintiff's testimony regarding the emotional impact of an event was somewhat restrained does not make it unreasonable for the jury to find that he suffered serious harm.  *See Gracia v. SigmaTron Int'l*, 842 F.3d 1010, 1022–23 (7th Cir. 2016) (explaining that juries "are responsible for evaluating the credibility of witnesses who testify to emotional distress" and that "brevity and self-control in a judicial proceeding need not be interpreted as a weak case").

Both Synnott and the defendants focus on whether the amount of compensatory damages is consistent with awards in other cases.  But the relatively few cases the parties cite are of limited use.  For example, although the Seventh Circuit has upheld much larger compensatory damages awards in excessive force cases, the plaintiffs in

17

those cases generally suffered significant physical harm and more egregious mistreatment than Synnott. *See, e.g.*, *Adams*, 798 F.3d at 543–44 (upholding multi-million-dollar damages awards for two brothers whom the police beat, called racial epithets, and unlawfully detained for as long as 200 days). But even though the cases the parties cite and those the Court has discovered through research are not precisely analogous to this case, the Court must nonetheless consider whether they indicate that the award of $250,000 is excessive. *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006) (explaining that "an exact analogy is not necessary" to compare the appropriateness of damage awards).

Two cases in particular furnish a useful comparison because they involve similar constitutional violations by law enforcement officers that did not result in lasting physical injuries. First, in *Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998), the plaintiff, a wheelchair user with medical impairments, died after a police officer used excessive force against him. The jury awarded a total of $100,000 in compensatory damages. In upholding the damages award, the Seventh Circuit noted that the jury could have reasonably concluded that the defendant officer did not cause the plaintiff's death and that the compensatory damages award was reasonably related to the plaintiff's pain and suffering during the course of his interaction with the officer. *Id.* at 1082 ("[I]t cannot be said that the jury's award of damages is inconsistent with either the evidence presented at trial or the jury's determination of liability."). This award would be the equivalent of about $164,000 in current dollars. [3]

---

[3] Using an inflation calculator made available by the U.S. Bureau of Labor Statistics, the Court estimates that when the jury reached its verdict in *Carter* on May 13, 1996, $100,000 was worth approximately $164,000 at the time of the jury's verdict in this case.

Another case, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), involved strip searches of female detainees in the city's lockup facilities. The plaintiffs testified that they experienced "shock, panic, depression, shame, rage, humiliation, and nightmares, with lasting effects on each woman's life." *Id.* at 1275. Based on that testimony, the Seventh Circuit upheld damages awards ranging from $25,000 to $60,000—or approximately $63,000–$152,000 in today's dollars.[4] Although the present case did not involve a strip search, *Mary Beth G.* provides a potentially useful point of reference because, as in this case, the plaintiffs suffered Fourth Amendment violations that, though they involved physical contact, resulted solely in mental and emotional harm.

The evidence Synnott presented at trial concerning the emotional and mental impact of the January 2, 2015 incident does not rationally justify a compensatory damages award exceeding the amounts upheld in *Carter* and *Mary Beth G.* The incident lasted only about forty-five minutes, a significantly shorter interval than the time periods at issue in other cases involving excessive force and unlawful detention. *See Adams*, 798 F.3d at 543–44 (noting that the plaintiffs were wrongfully detained for 204 and 45 days each); *Wells v. City of Chicago*, 896 F. Supp. 2d 725, 740–41 (N.D. Ill. 2012) (Kennelly, J.) (ordering a remittitur of compensatory damages from $1 million to

---

*See* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=100%2C000.00&year1=199605&year2=201905 (last visited Sept. 5, 2019).

[4] This estimate is based on the date on which the Seventh Circuit issued its decision in *Mary Beth G.* because the Court is unable determine the date the jury made the underlying damages award. *See* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=60000&year1=198311&year2=201905 (last visited Sept. 5, 2019).

$250,000 for a plaintiff who was unlawfully detained for five hours). And the evidence does not reasonably support a conclusion that Burgermeister's and Northrup's conduct was as objectively egregious as that of the defendant in *Carter*, who roughly searched the plaintiff—a young man with partial paralysis, cerebral palsy, and serious heart and liver problems who had recently suffered a stroke and used a wheelchair—by holding him against a concrete pillar. *See Carter*, 165 F.3d at 1074–75. The presence of pain and possible physical injury in to the plaintiff in *Carter* further distinguishes it from this case. *See also Mason v. City of Chicago*, 641 F. Supp. 2d 726, 731 (N.D. Ill. 2009) (upholding compensatory damages of $625,000 for a plaintiff who suffered a painful orbital fracture and emotional suffering after being beaten by police).

Similarly, the invasiveness of the strip searches in *Mary Beth G.*, which the court described as "demeaning, dehumanizing, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission," *Mary Beth G.*, 723 F.2d at 1272, renders them objectively more harmful than the seizure at gunpoint Synnott experienced—though the Court does not intend by this to minimize the emotional impact of the pointing of a firearm. Thus, although the jury reasonably concluded that Synnott suffered serious harm when the deputies unlawfully entered his home and Northrup pointed a gun at him, the evidence of his mental and emotional suffering does not reasonably support an award of $250,000.

Affording the jury's damages award appropriate deference, the Court concludes that $250,000 in compensatory damages is excessive in light of the evidence of the harm Synnott suffered and in comparison with comparable cases. The Court concludes that a compensatory damages award not exceeding $125,000 rationally reflects the

20

evidence adduced at trial. The Court will grant the defendants' motion for a new trial on the issue of damages unless Synnott accepts, within thirty-five days of this order, a reduction of the compensatory damages award to $125,000. The Court notes that if Synnott elects to pursue a new trial, "the jury must be allowed to consider both compensatory and punitive damages." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018). The Court is giving Synnott more time than it would ordinarily allow to make this decision in order to give him a reasonable amount of time to contact and consult with counsel regarding the decision—something the Court strongly urges him to do.

The Court advises the parties that if Synnott declines to accept this reduced compensatory damages award, the resulting new trial will concern *only* the issues of compensatory and punitive damages on his claim involving the defendants' unlawful entry into his home and Northrup's use of excessive force. *See id.* ("Because compensatory and punitive damages are correlated, they must be considered jointly. But a second jury need not reconsider [the defendants'] liability."). That is, the new trial will not involve any of the claims or defendants that the Court has dismissed from the case, and the Court will not revisit its ruling denying Synnott leave to file his proposed fourth amended complaint. Rather, the subject matter of the new trial will be confined to the question of damages on the unlawful entry claim against both defendants and the excessive force claim against Northrup. Moreover, Synnott will not be permitted to introduce the damages evidence that he contends the Court erroneously excluded, i.e., evidence relating to a supposed connection between the Fourth Amendment violations and the outcome of his child custody dispute. The Court has ruled on each of these

21

issues numerous times and will not entertain further motions to reconsider.[5] The sole purpose of a new trial—should Synnott elect to pursue one rather than accept the reduced compensatory damages award—would be to allow a jury to determine the appropriate amount of damages based on evidence that may properly be presented to the jury, not to broaden Synnott's claims or relitigate any of the Court's prior rulings.

### 4.    Punitive damages

The defendants also argue that the evidence at trial was insufficient to reasonably support the imposition of punitive damages. Alternatively, they contend that the awards of punitive damages—$70,000 against Northrup and $30,000 against Burgermeister—are excessive.

In an action under 42 U.S.C. § 1983, a jury may assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). To determine whether the amount of punitive damages is appropriate, the Court considers three factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Estate of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

---

[5] Synnott may, of course, raise these issues on appeal if he elects to accept the remittitur.

The evidence in this case reasonably supports both the jury's decision to assess punitive damages against Northrup and Burgermeister and the amount of punitive damages it awarded. The jury concluded that Burgermeister and Northrup unlawfully entered Synnott's home and did not knock or announce their presence. Both Burgermeister and Northrup testified that they knew it would be unconstitutional to do so. And the jury could have reasonably found that Northrup was at least recklessly indifferent to Synnott's Fourth Amendment rights in using his gun to effect a seizure of unarmed individuals who posed no apparent threat. This evidence supports a reasonable inference that Burgermeister and Northrup "trample[d] on the plaintiff's rights, in a fashion that can fairly be called reckless." *Soderbeck v. Burnett County*, 752 F.2d 285, 289 (7th Cir. 1985).

The Court also defers to the jury's determination of the appropriate amount of punitive damages. Its determination regarding the amount of money necessary to punish the defendants and deter others from engaging in similar misconduct "is precisely the sort of judgment peculiarly within the province of the finder of fact." *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 582 (7th Cir. 1996). For the reasons previously stated, the jury reasonably found that the deputies caused Synnott serious mental and emotional harm. And even if the defendants' conduct was not as extreme as that of law enforcement officers in certain other excessive-force cases, the jury could have reasonably concluded that the deputies' entrance into the house and Northrup's use of excessive force were "completely unjustified" under the circumstances, making their conduct reprehensible. *See Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009). Finally, the award in this case is less than the

compensatory damages award—even at the dollar amount to which the Court has granted a remittitur—and thus does not suggest "constitutional impropriety." *J.K.J.*, 928 F.3d at 604 (noting that a ratio between punitive and compensatory damages of less than two-to-one raises no constitutional problem); *see also Estate of Moreland*, 395 F.3d at 757 ("The defendants have not identified a single appellate case questioning the constitutionality of a punitive damages award that is a fraction of the underlying compensatory damages award.  Nor have we.").  The Court therefore declines to disturb the jury's award of punitive damages.

### Conclusion

For the foregoing reasons, the Court denies the plaintiff's motion for a new trial, which he has styled has a motion for a supplemental trial [dkt. no. 131].  The Court denies the defendants' motion for judgment as a matter of law or a new trial [dkt. no. 128] except to the extent that the defendants seek remittitur of the compensatory damages award.  Unless the plaintiff advises the Court on or before October 11, 2019 that he accepts a reduction of the compensatory damages award to $125,000, the Court will grant in part the defendants' motion for a new trial on the issue of compensatory and punitive damages.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 5, 2019

24